# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | |
|---|---|---|
| **HERITAGE ALLIANCE,** | § | |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | **Case No.  1:18-cv-00939-RP** |
| | § | |
| **THE AMERICAN POLICY** | § | |
| **ROUNDTABLE, d/b/a OHIO** | § | |
| **ROUNDTABLE,** | § | |
| *Defendant* | § | |

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

**TO: THE HONORABLE ROBERT PITMAN**
   **UNITED STATES DISTRICT JUDGE**

Before the Court are Plaintiff Heritage Alliance's Motion for Summary Judgment (Dkt. 38) and Defendant The American Policy Roundtable's Motion for Summary Judgment (Dkt. 39), both filed April 30, 2020, and the associated response and reply briefs. The District Court referred the motions to the undersigned for report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72, and Rule 1(d) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas.

## I.    Background

Plaintiff Heritage Alliance ("Heritage") is a Texas nonprofit corporation that supports conservative legislation and evaluates political candidates. *See* Declaration of Debbie Wuthnow ("Wuthnow Dec."), President of Heritage, Dkt. 38-1 ¶¶ 3-5. Heritage registered the domain name **iVoterGuide.com** on December 31, 2007. *Id.* ¶ 7. Heritage owns U.S. trademark



Reg. No. 4981328, issued June 21, 2016 for composite mark                          with

"IVOTERGUIDE" disclaimed for "providing a website featuring information regarding candidates for public office," in International Class 35.[1] Dkt. 44-2 at 4-5.

Defendant The American Policy Roundtable ("APR"), an Ohio nonprofit corporation, provides voter information, including facts about candidates for political office, under the mark **IVOTERS**, including through the domain **iVoters.com**. Declaration of David Zanotti, APR President and CEO, Dkt. 39-4 ¶¶ 3-8. APR owns two federal trademark registrations:

- **IVOTERS.COM FREE MINDS FREE SPEECH FREE AGENTS**, in standard characters and with "FREE SPEECH" disclaimed, issued September 6, 2011 (Reg. No. 4021472). Dkt. 38-11; and

-  , with "VOTERS" and "FREE SPEECH" disclaimed, issued September 13, 2016. (Reg. No. 5039154). *Id.*

APR also owns pending applications for the marks **IVOTERS** (Serial No. 88271491) and **IVOTERS.COM** (Serial No. 88271486), both in standard characters, filed January 22, 2019. Dkt. 42-2 at 58-76. All four registrations and applications recite the same services: "Providing a web site of information on current public policy issues, political campaigns and citizen concerns related to political issues," in International Class 35. Heritage filed Opposition No. 91249712 to registration of the pending applications, and the Trademark Trial and Appeal Board ("TTAB") has suspended the opposition proceeding pending the outcome of this litigation.[2]

---

[1] Heritage also owns a pending application to register the standard character mark **IVOTERGUIDE** for the same services (Serial No. 88348774). Dkt. 39-3 at 71-73. The application has been initially refused on the basis of a likelihood of confusion with Defendant's registrations and prior-filed applications. Dkt. 42-2 at 95-150.

[2] The Court takes judicial notice of publicly available records on the United States Patent and Trademark Office website, uspto.gov, pursuant to FED. R. EVID. 201(b). *See, e.g.*, *Mass. v. Westcott*, 431 U.S. 322, 322 n.2 (1977) (per curiam); *Basic Capital Mgmt., Inc. v. Dynex Capital, Inc.*, 976 F.3d 585, 589 (5th Cir. 2020).

On October 31, 2018, Heritage filed this lawsuit against APR. In its First Amended Complaint, Heritage asserts claims of cyberpiracy under the Anticybersquatting Consumer Protection Act ("ACPA"), Section 43(d) of the Trademark Act of 1946 ("Lanham Act"), 15 U.S.C. § 1125(d); trademark infringement and unfair competition under Lanham Act Sections 32 and 43(a), 15 U.S.C. §§ 1114, 1125(a); and trademark infringement, unfair competition, and unjust enrichment under Texas common law. In its Answer, APR asserts counterclaims for infringement and false designation of origin under Sections 32 and 43(a) of the Lanham Act, and for trademark infringement and unfair competition under Texas common law. APR also seeks cancellation of Heritage's registration under Lanham Act Section 37, 15 U.S.C. § 1119. Dkt. 26.

More than four months after Heritage filed its suit against APR, on March 11, 2019, APR filed suit against Heritage in the United States District Court for the Northern District of Ohio (Civil Action No. 1:19-cv-00535). APR alleged trademark infringement and false designation of origin and sought to cancel Heritage's registration under the Lanham Act, and also alleged trademark infringement under Ohio common law. *See* Dkt. 7-7. APR moved to dismiss this case, and Heritage moved to dismiss or transfer the Ohio action. *See* Dkts. 7, 8.

On July 23, 2019, Judge Pitman entered an order granting in part and denying in part each party's motion to dismiss. Dkt. 25. The District Court found that Heritage's action was the first-filed case but dismissed with prejudice Heritage's federal and common law claims for trademark infringement, unfair competition, and unjust enrichment, pursuant to Rule 12(b)(6). *Id.* The Ohio court then transferred APR's second-filed case to this Court, where it was designated No. 1:19-CV-906-RP. Dkt. 36. The District Court consolidated the cases on August 13, 2020. Dkt. 50.

Heritage now seeks summary judgment on its sole surviving claim of cyberpiracy. Heritage also seeks dismissal of all APR's counterclaims, arguing that Heritage has trademark priority, there is no likelihood of confusion between the parties' marks, and APR's claims are barred by laches.

APR, in turn, alleges that Heritage cannot satisfy the elements of its cyberpiracy claim, and that APR is entitled to judgment as a matter of law on its trademark infringement and unfair competition claims. APR also asks the Court to order that Heritage is "disentitled" to registration of its pending trademark application, APR is entitled to federal registration of its two pending applications, and the TTAB opposition proceeding is dismissed.

## II.    Legal Standard

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials, and any affidavits on file show that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Id.*

When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. A court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *see also Anderson*, 477 U.S. at 255.

4

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation also are not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports its claim. *See Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

Where, as here, the parties have filed cross-motions for summary judgment, the Court "review[s] each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Green v. Life Ins. Co. of N. Am.*, 754 F.3d 324, 329 (5th Cir. 2014) (quoting *Duval v. N. Assur. Co. of Am.*, 722 F.3d 300, 303 (5th Cir. 2013)).

### III.    Analysis

The Court first addresses APR's trademark infringement and unfair competition claims, then considers Heritage's cyberpiracy claim.

#### A.  Priority

The basic rule of trademark ownership in the United States is priority of use. 2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 16:1 (5th ed. Dec. 2020 update) ("MCCARTHY"). All common law and registration rights rest on "this foundation of first-in-time, first-in-right." *Id.*; *see also, e.g.*, *Hana Fin., Inc. v. Hana Bank*, 574 U.S. 418, 419 (2015)

("Rights in a trademark are determined by the date of the mark's first use in commerce. The party who first uses a mark in commerce is said to have priority over other users.").

Heritage argues that it has trademark priority because it used the marks iVoterGuide and iVoterGuide.com (together, the "iVoterGuide Marks") to identify its services before APR's first use in 2010. Dkt. 43 at 4. APR contends that priority in its favor "has already been settled in this matter" by the Court's order on the motions to dismiss. Dkt. 39-1 at 15. In the alternative, APR argues that its incontestable registration for the mark IVOTERS.COM FREE MINDS FREE SPEECH FREE AGENTS is conclusive evidence of its exclusive right to use that mark, citing Section 15 of the Lanham Act, 15 U.S.C. § 1065. *Id.* Finally, APR submits that: "There is no genuine issue of material fact that APR began using iVoters as the name for its voter information website and service in February of 2010, well before Heritage ever utilized any of its alleged marks." *Id.* at 16.

The summary judgment record raises a genuine issue of material fact as to priority. Taking each of APR's arguments in turn, the District Court's order on the motions to dismiss was based only on Heritage's amended complaint, its attachments, and certain documents referenced in the amended complaint. Dkt. 25 at 6. The District Court concluded that Heritage made contradictory allegations by pleading that APR created the domain name iVoters.com as early as 2003, while also alleging that APR first used the iVoters mark in 2010. Dkt. 25 at 11. The District Court found, "for the purposes of resolving this motion to dismiss, that the iVoters mark was used commercially as early as 2003 when it was featured in APR's domain name." Dkt. 25 at 12.

The undersigned agrees with Heritage that the District Court's finding, by its own explicit terms, was limited to resolution of the motions to dismiss. The District Court determined that Heritage could not establish priority on its trademark claims as pleaded, but did not hold that APR

6

established priority in its own marks, as it must to prevail on its claims. Here, at the summary judgment stage, neither party contends that the issue of priority is controlled by APR's 2003 domain name registration; to the contrary, APR states that "simply registering a domain name does not constitute 'use' for purposes of acquiring trademark priority." Dkt. 39-1 at 14. Instead, as noted, APR argues that its use of iVoters dates to February 2010. The undersigned concludes that the issue of trademark priority was not determined by the District Court's order on the motions to dismiss.

With regard to APR's second argument, APR correctly points out that its incontestable registration for IVOTERS.COM FREE MINDS FREE SPEECH FREE AGENTS is conclusive evidence of its exclusive right to use that mark. There is an exception, however,

> to the extent, if any, to which the use of a mark registered on the principal register infringes a valid right acquired under the law of any State or Territory by use of a mark or trade name continuing from a date prior to the date of registration under this chapter of such registered mark.

Lanham Act Section 15. As Professor McCarthy explains: "The nonregistered rights of a senior user continue and are not erased by the later federal registration of a junior user. This is true even if the registration has achieved 'incontestable' status." 2 MCCARTHY § 16:18.50. The fact that one of APR's trademark registrations incorporating the term iVoters is incontestable does not alone establish its priority over Heritage's asserted prior use at common law of the iVoterGuide Marks.

Evidence submitted by Heritage raises a genuine issue of material fact as to whether it developed senior rights in iVoterGuide.com. Heritage's evidence pertains to acquired distinctiveness, also called secondary meaning, a mental association between the alleged mark and a single source of goods or services. *See Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 211 (2000); 2 MCCARTHY § 15:5.

In 2008, before APR's 2010 date of first use, Heritage began directing panelists to iVoterGuide.com to evaluate political candidates. Wuthnow Dec., Dkt. 38-1 ¶ 8. Heritage filed declarations from three of those candidate evaluation panelists, all stating in part that: "In 2008, and certainly before 2010," they "associated IVOTERGUIDE with Heritage Alliance and its providing of a website that provided information about candidates running for office." Dkt. 38-10. Even though Heritage was not promoting its services to the general public under the name iVoterGuide in 2008, to the extent that term came to identify Heritage as the source of "a website featuring information regarding candidates for public office," Heritage developed trademark rights in the name for that service. *See, e.g.*, *N.Y. Yankees P'ship v. IET Prods. & Servs., Inc.*, 114 USPQ2d 1497, 2015 WL 2455162, at *6 (TTAB 2015) ("We have found that in certain circumstances a nickname or a trade name for a product or service may acquire trademark significance when the public has come to know and use it as such 'even if the company itself has made no use of the term.'") (quoting *Am. Stock Exch., Inc. v. Am. Express Co.*, 207 USPQ 356, 1980 WL 30139, at *9 (TTAB 1980) (regarding AMEXCO for American Express Company)); *Nat'l Cable Television Ass'n, Inc. v. Am. Cinema Eds., Inc.*, 937 F.2d 1572, 1577 (Fed. Cir. 1991).

In order to determine whether Heritage's evidence is of a type and quantity sufficient to establish that the iVoterGuide Marks acquired distinctiveness before APR's first use date, the Court would have to make credibility determinations and weigh the evidence, undertakings impermissible at summary judgment. Because there is a fact issue as to priority, the undersigned recommends that APR's motion for summary judgment on its claims for federal and state trademark infringement and unfair competition be denied.

**B.  Cyberpiracy**

Both parties seek summary judgment on Heritage's claim that APR's registration and use of the domain name iVotersGuide.com, which differs from Heritage's domain iVoterGuide.com only by the addition of an "s," violates the ACPA. The ACPA provides that:

> (1)(A) A person shall be liable in a civil action by the owner of a mark . . . if, without regard to the goods or services of the parties, that person—
>
> > (i) has a bad faith intent to profit from that mark . . . and
> >
> > (ii) registers, traffics in, or uses a domain name that—
> >
> > > (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark . . . .

Lanham Act Section 43(d)(1)(A), 15 U.S.C. § 1125(d)(1)(A). To prevail on its ACPA claim, Heritage must show that (1) its mark is a distinctive or famous mark entitled to protection; (2) the domain name at issue is identical or confusingly similar to Heritage's mark; and (3) APR registered the domain name with the bad faith intent to profit. *Texas Int'l Prop. Assocs. v. Hoerbiger Holding AG*, 624 F. Supp. 2d 582, 587 (N. D. Tex. 2009).

APR contends that summary judgment should be granted dismissing Heritage's ACPA claim because Heritage has failed to carry the first and third elements. With respect to the first element, as stated above, Heritage submitted evidence creating a fact issue as to whether iVoterGuide.com had acquired distinctiveness as early as 2008, long before APR registered the iVotersGuide.com domain name in 2016.

The third ACPA element is whether APR registered the domain name iVotersGuide.com "with the bad faith intent to profit." APR contends there is no evidence it had a bad faith intent to profit from the domain name registration. Dkt. 39-1 at 11. Heritage argues that "APR's intent was to divert Heritage's website users to the ivoters.com website." Dkt. 43 at 3.

"[A] bad faith determination under ACPA should be made with regard to the totality of the circumstances." *Texas Int'l Prop. Assocs.*, 624 F. Supp. 2d at 590. The statute lists nine nonexclusive factors courts may consider, including the following factors relevant to this analysis:

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name;
>
> . . .
>
> (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
>
> (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
>
> (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site . . . .

Lanham Act Section 43(d)(1)(B)(i), 15 U.S.C. § 1125(d)(1)(B)(i).

The first bad-faith factor goes to the core of the parties' dispute: whether any trademark rights APR owns extend to iVotersGuide.com. The third and fourth factors weigh in favor of a finding of bad faith. The record shows that APR does not offer a voter guide and neither used the domain name iVotersGuide.com in connection with the bona fide offering of any goods or services prior to registration, nor made any use of the mark iVotersGuide in a site accessible under the domain name.

The fifth factor is particularly relevant here. This factor contemplates whether APR intended to divert consumers from Heritage's site "to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site." *Id.*

In essence, APR contends that it cannot have a bad faith intent to profit from registration of iVotersGuide.com because it is a nonprofit corporation. *See* Dkt. 39-1 at 12 ("First, and most tellingly, APR is a *non-profit*."); Dkt. 45 at 3 (stating that "APR's usage of its trademarks is not for any commercial profit or gain"). The prevailing view, however, is that "the ACPA does not require commercial activity or gain as an element of liability." *McAllister Olivarius v. Mermel*, 298 F. Supp. 3d 661, 675 (S.D.N.Y. 2018). As Professor McCarthy has reasoned, the fourth bad-faith factor would be meaningless if all noncommercial uses were exempt from liability for an ACPA violation. 5 MCCARTHY § 25A:64. As Heritage argues, courts have not interpreted the ACPA so narrowly. For example, in *U.S. Fallen Heroes Found. v. Am. Fallen Warrior Mem'l Found.*, No. 3:11-CV-99872-P, 2011 WL 13234904 (N.D. Tex. Oct. 19, 2011), a case involving two nonprofit organizations, the Northern District of Texas granted a preliminary injunction sought by the owner of the domain name IGave50Cents.com enjoining use of the domains WeGave50Cents.com and IGaveMyCoins.com. The court found the fifth ACPA factor "particularly important," stating that the defendants apparently attempted to profit from plaintiff's goodwill and reputation, and to divert consumers from plaintiff's organization to defendant's organization. *Id.* at *3.

Here, considering the totality of the circumstances, the evidence raises a genuine issue of material fact regarding the nature of APR's intent to divert traffic from Heritage's website to its own. APR CEO Zanotti testified that he knew Heritage owned iVoterGuide.com when APR registered the nearly identical domain iVotersGuide.com in 2016, two years before APR first contacted Heritage, and that he registered the domain in response to instances of alleged consumer confusion. Dkt. 38-6, Zanotti Deposition Transcript at 100:2-20. APR argues that its "intent in purchasing domains such as ivotersguide.com was not to divert traffic from Heritage; rather, it was

to correct the confusion *created by Heritage* and redirect traffic intended for APR, to APR." Dkt. 42 at 4. To grant summary judgment on Heritage's ACPA claim would require a finding as to APR's intent in registering iVotersGuide.com. "These types of determinations, which involve the summary judgment movants' state of mind, are particularly ill-suited for summary judgment." *Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 459 (5th Cir. 2005); *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1265 (5th Cir. 1991) ("Accordingly, we have emphasized repeatedly that cases which turn on the moving party's state of mind are not well-suited for summary judgment.").

APR also points out that the ACPA includes a safe harbor provision where "the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." Lanham Act Section 43(d)(1)(B)(ii), 15 U.S.C. § 1125(d)(1)(B)(ii). Once again, to decide whether the safe harbor provision applies would require the Court to make credibility determinations as to APR's belief concerning fair use and to weigh the evidence to decide whether any such belief was reasonable, improper at summary judgment.

## C. Laches

Finally, the Court addresses Heritage's assertion that APR's claims are barred by the doctrine of laches. It is undisputed that APR discovered Heritage's use of the iVoterGuide Marks in August 2015, but took no action until Zanotti sent a demand letter in September 2018, more than three years later. *See* Dkt. 38-7, Response to Interrogatory No. 8; Dkt. 38-8 at 2.

"Laches is an inexcusable delay that results in prejudice to the defendant." *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 622 (5th Cir. 2013) (quotation omitted). The three elements of laches are (1) delay in asserting trademark rights, (2) lack of excuse for the delay, and (3) undue prejudice to the defendant caused by the delay. *Id.* Because the Lanham Act contains no statute of limitations, federal courts apply the defense of laches to untimely claims, referring to analogous state statutes

of limitations to aid in determining what length of delay is excusable. *See SFPM L.P. v. Midmark Corp.*, Civil No. SA-15-CA-00124-FB, 2017 WL 5235670, at *12 (W.D. Tex. July 31, 2017), *report and recommendation adopted*, 2017 WL 5484692 (W.D. Tex. Sep. 14, 2017).

APR argues: "Every federal district in Texas has examined this issue and determined that the applicable statute of limitations for Lanham Act claims—and thus the basis to evaluate any delay and whether it is excusable—comes from Texas' four-year statute of limitations period for fraud claims." Dkt. 42 at 17 (citing *Ogden v. Cozumel, Inc.*, No. A-18-CV-00358-LY, 2019 WL 4144324, at *6 (W.D. Tex. Aug. 29, 2019), *report and recommendation adopted*, 2019 WL 77590198 (W.D. Tex. Sep. 18, 2019); *Mary Kay, Inc. v. Weber*, 601 F. Supp. 2d 839, 859-60 (N.D. Tex. 2009); *Edmark Indus. SDN. BHD. v. South Asia Int'l (H.K.) Ltd.*, 89 F. Supp. 2d 840, 846 (E.D. Tex. 2000); and *Derrick Mfg. Corp. v. Sw. Wire Cloth, Inc.*, 934 F. Supp. 796, 804 (S.D. Tex. 1996)); *see also Jaso v. Coca Cola Co.*, 435 Fed. App'x 346, 356 (5th Cir. 2011) ("The parties do not dispute, and we assume for purposes of this case, that the most analogous Texas statute of limitations for a Lanham Act claim is the four-year statute of limitations applied to fraud claims under § 16.004 of the Texas Civil Practice & Remedies Code."). Though Heritage "recognizes that the prevailing standard in Texas appears to establish a four-year statute of limitations based on the Texas Fraud Statute, and that this Court has previously so held, it argues that the Texas two-year statute of limitations period for unfair competition claims should apply instead." Dkt. 38 at 15-16.

Heritage's argument is not persuasive, but the Court need not decide this issue because Heritage offers no evidence and merely a single-sentence conclusory argument to meet the third element of laches: that it has suffered undue prejudice caused by APR's delay. *See* Dkt. 38 at 17. Heritage thus has not established a prima facie case of laches as a matter of law. *See Namer v. Broad. Bd. of Governors*, 628 Fed. App'x 910, 913 (5th Cir. 2015); *Bulbs 4 East Side, Inc. v. Ricks*,

13

199 F. Supp. 3d 1151, 1164 (S.D. Tex. 2016) ("Unsupported allegations cannot create a genuine issue of material fact, and Defendant's failure to provide evidence of prejudice suffered 'renders all other facts immaterial.'") (quoting *Celotex*, 477 U.S. at 323).

## IV.   Recommendation

Based on the foregoing, the undersigned **RECOMMENDS** that the District Court **DENY** both Plaintiff's Motion for Summary Judgment (Dkt. 38) and Defendant's Motion for Summary Judgment (Dkt. 39).

The Court **FURTHER ORDERS** that this case be removed from the Magistrate Court's docket and returned to the docket of the Honorable Robert Pitman.

## V.   Warnings

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except on grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

**SIGNED** on November 30, 2020.

_____
SUSAN HIGHTOWER
UNITED STATES MAGISTRATE JUDGE

14